UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------------------------ x
MICHAEL PERCOCO, Individually and On           :
Behalf of All Others Similarly Situated,       :     Civil Action No: 1:12-cv-01001-SLR
                                               :
           Plaintiff,                          :
                                               :     AMENDED CLASS ACTION COMPLAINT
           vs.                                 :     FOR VIOLATION OF THE FEDERAL
                                               :     SECURITIES LAWS
DECKERS OUTDOOR CORPORATION,                   :
ANGEL MARTINEZ and THOMAS A.                   :     **JURY TRIAL DEMANDED**
GEORGE,                                        :
                                               :
           Defendants.                         :
------------------------------------------------------ X

The allegations in this Amended Complaint are based upon Plaintiff's personal knowledge as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including, without limitation, a review and analysis of United States Securities and Exchange Commission ("SEC") filings by Deckers Outdoor Corporation ("Deckers" or the "Company"), as well as press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Deckers and the other defendants named herein (together with Deckers, the "Defendants"). Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiff believes that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of investors who suffered damages as a result of their transactions in Decker securities between October 27, 2011 and April 26, 2012,

inclusive (the "Class Period"), which seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  These claims are asserted against Deckers and certain of its officers who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and in the Company's filings with the SEC.

2.      Deckers manufactures shoes and apparel, including brands such as UGG, Teva and Sanuk.  The Company is listed on the NASDAQ under the ticker symbol "DECK".

3.      During the Class Period, Defendants disseminated false and misleading statements to the investing public that emphasized favorable sales and earnings expectations.

4.      On October 27, 2011, Defendants released Deckers' 3Q11 financial results and noted it was an "exceptionally strong period of sales and earnings for our company led by the UGG brand."  Based on these results, Defendants also raised Deckers' FY11 revenue and earnings guidance.  Defendants failed to disclose, however, adverse facts undermining the accuracy of these assurances, including unmitigated rising raw materials costs and maximum inventory build-up resulting in massive price cuts.

5.      Then on February 23, 2012, Deckers reported "record" 4Q11 and FY11 financial results, specifically noting the Company had programs in place making it capable of fully offsetting any increase in the cost of sheepskin – the primary component of Deckers' flagship UGG brand products such that no effect would be felt on the Company's 2012 bottom-line earnings.  As was disclosed by Defendants two months later, however, this was not the case.

6.      On April 26, 2012, Defendants shocked the market by announcing Deckers had failed to meet its second quarter 2012 earnings targets primarily due to an unmitigated increase in cost of goods sold.  Furthermore, Defendants disclosed Deckers had lowered its full year 2012

guidance from flat earnings to, instead, a decrease in 2012 diluted earnings per share of between 9% and 10%.

7.     As the truth regarding the Company's financial condition emerged, unsuspecting investors watched the price of the Company's stock drop from a Class Period high of $117.66 per share to $51.829 on April 27, 2012, a decline of over 60%, with the price of Deckers options correspondingly affected.  Through this action, Plaintiff seeks to recover for himself and absent Class members (defined below) the devastating losses that were suffered as a result of the Company's and its officers' fraud.

## JURISDICTION AND VENUE

8.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b) and 78(t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

9.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Deckers is incorporated in this District.

11.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

12.     Plaintiff Michael Percoco, as set forth in his previously filed certification and incorporated by reference herein, invested in Deckers options at prices impacted by the Defendants' fraud during the Class Period and has been damaged thereby.

13.     Defendant Deckers markets footwear and accessories for outdoor and everyday casual lifestyle.  The Company is a Delaware corporation with its principal place of business in Goleta, California.

14.     Defendant Angel Martinez ("Martinez") is and was, at all relevant times, the Company's Chief Executive Officer.

15.     Defendant Thomas A. George ("George") is and was, at all relevant times, the Company's Vice President and Chief Financial Officer.

16.     Martinez and George are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their position with the Company, had the authority to control and correct the contents of Deckers' public disclosures to the market.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") consisting of all persons who transacted in Deckers securities during the Class Period and who suffered damages as a result of Deckers artificially inflated share price.  The Class Period runs from October 27, 2011 through April 26, 2012.  Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

18.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members remains unknown at this time, Plaintiff believes that there are thousands of members of the Class.  Record owners and

Class members can be notified of the pendency of this action by publication, using forms of notice similar to those customarily used in securities class actions.

19.     Plaintiff's claims are typical of the other members of the Class because Plaintiff and all of the Class members sustained damages that arose out of the Defendants' unlawful conduct complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interests that are contrary to, or in conflict with, the interests of the Class members that he seeks to represent.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection and intends to prosecute this action vigorously.

21.     A class action is superior to other methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for wrongs done to them.  There will be no difficulty in the management of this action as a class action.

22.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants.   Questions of law and fact common to members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  The questions of law and fact common to the Class include, but are not limited to, the following:

a.      whether Defendants' acts violated the federal securities laws as alleged herein;

b.      whether Defendants' publicly disseminated statements during the Class Period omitted and/or misrepresented material facts;

c.      whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

d.      whether the price of Deckers' securities was artificially inflated as a result of the material misrepresentations and omissions complained of herein;

e.      whether the Individual Defendants were controlling persons as alleged herein; and

f.      whether members of the Class have sustained damages and, if so, the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

23.      On October 27, 2011, the first day of the Class Period, Deckers issued a press release titled "Deckers Outdoor Corporation Reports Record Third Quarter 2011 Financial Results" announcing its financial results for the quarter ending September 30, 2011.  For the quarter, the Company reported earnings per share of $1.59 and net sales of $414.4 million.  The press release touted Deckers' operations and sales by stating, in part, the following:

GOLETA, Calif. – October 27, 2011

Deckers Outdoor Corporation (NASDAQGS:  DECK) today announced financial results for the third quarter ended September 30, 2011.

Third Quarter Highlights

•      Net sales increased 49.1% to $414.4 million compared to $277.9 million last year.

•      Gross margin increased 1.9 percentage points to 49.0% compared to 47.1% last year.

•      Diluted EPS increased 48.6% to $1.59 compared to $1.07 last year.

•      UGG® brand sales increased 47.3% to $376.7 million compared to $255.8 million last year.

•      International sales increased 113.8% to $156.4 million compared to $73.2 last year.

•      Domestic sales increased 26.0% to $257.9 million compared to $204.7 million last year.

- Same store sales rose 15.4%.

- eCommerce sales increased 18.3% to $10.3 million compared to $8.7 million last year.

"The third quarter was an exceptionally strong period of sales and earnings growth for our Company led by the UGG brand," stated Angel Martinez, President, Chief Executive Officer and Chair of the Board of Directors.  "We experienced higher domestic wholesale demand for the UGG brand fall line versus a year ago driven by the introduction of several new styles and new collections, including a broader assortment of men's product.  At the same time, our international sales more than doubled fueled by the growth in wholesale unit volumes in the United Kingdom and Benelux, coupled with an increase in sales resulting from our conversion to wholesale operations in these regions.  Our retail stores, which now total 37 worldwide, performed very well during the third quarter highlighted by a 15.4% same store sales increase.  The growth of the spring line earlier this year combined with the solid start to fall has created strong momentum for the UGG brand as we head into the holidays."

Mr. Martinez continued, "Fiscal 2011 is on track to be another record year for Deckers Outdoor Corporation with the UGG brand poised to surpass $1 billion in annual sales.  Equally important, we have made strategic investments that have strengthened our global operating platform and better positioned the company for sustainable long-term growth.  These included our acquisition of the Sanuk® brand, our hiring of key personnel to spearhead international expansion, additional marketing and advertising investments, and our planned opening of a total of 17 new company-owned stores in fiscal year 2011.  As we look out to next year, we remain optimistic about our growth opportunities despite some of the current headwinds facing the global economy.  However, we will experience further increases in raw material prices in 2012."

*          *          *

Inventories at September 30, 2011 increased 80.9% to $356.9 million compared to $197.3 million at September 30, 3010.  By brand, UGG inventory increased $143.7 million at September 30, 2011, and our other brands' inventory increased $1.0 million to $6.8 million at September 30, 2011.  Sanuk brand inventories were $9.2 million at September 30, 2011.  The increase in inventory at September 30, 2011 was primarily attributable to the growth in fourth quarter orders for the UGG brand, the warehousing of fourth quarter 2011 inventory supporting the new wholesale United Kingdom and Benelux business that was fulfilled by international distributors last year, the increase in retail stores, and the additional inventory associated with the Sanuk brand.

*          *          *

Full-Year 2011 Outlook

Based on better than expected third quarter results the Company is raising its full-year outlook as follows:

- The Company now expects its full-year revenue to increase approximately 33% over 2010 levels, compared to previous guidance of approximately 26%. UGG brand sales are expected to increase approximately 32%, compared to previous guidance of 25%. Teva brand sales are expected to increase by approximately 20%, while other brand sales are expected to be down by approximately 10%. The newly acquired Sanuk brand is expected to generate sales in the high $20 million range.

- The Company now expects its full-year diluted earnings per share to increase approximately 22% over 2010, compared to previous guidance of approximately 17%. This guidance assumes a gross profit margin of approximately 50% and SG&A as a percentage of sales of approximately 29%.

- Fiscal 2011 guidance includes estimates of approximately $31.6 million, or $0.56 per diluted share, pertaining to incremental investments and expenses in 2011 associated with new marketing and advertising programs, increased legal spend related to intellectual property rights protection, expenses related to the transition to a wholesale business model in Europe, and due diligence, audit, and transaction fees associated with the acquisition of the Sanuk brand.

- Fiscal 2011 guidance also includes approximately $4.9 million of amortization expense related to Sanuk brand intangible assets and approximately $2.8 million of accretion expense related to estimated contingent payments for the acquisition of the Sanuk brand. The $4.9 million of amortization expense and $2.8 million of accretion expense related to the Sanuk brand acquisition is subject to purchase price allocation adjustments.

Fourth Quarter Outlook

The Company now expects fourth quarter 2011 revenue to increase approximately 29% over 2010 levels, compared to previous guidance of approximately 22%, and diluted earnings per share to increase approximately 33% over 2010 levels, compared to previous guidance of approximately 36%. The fourth quarter 2011 now includes approximately $2.0 million of additional expenses that were previously budgeted for the third quarter of 2011.

24.    Also on October 27, 2011, the Company held an earnings conference call to discuss its financial results. During the call, Defendants made numerous positive statements about the Company. Defendant Martinez stated:

As you saw from our press release issued earlier, we had a great quarter. Sales increased 49% to $414 million and diluted EPS increased 49% to $1.59, both

8

third quarter records for the company.  Our recent performance was driven by strong demand for the UGG brand across our multiple distribution channels and geographic regions.

Our UGG brand domestic wholesale business increased double-digits for the fourth consecutive quarters.  I think it's important to point out that the growth of our U.S. wholesale business continues to come from higher door productivity versus new door growth.  Our strategy of keeping distribution tight and going after more shelf space within our account base of better department stores, specialty footwear retailers and key independents is clearly working.  Through the ongoing evolution of our UGG line, we've succeeded in significantly increasing the average SKU count per door over the past several years and now command more retail real estate, including more than 350 shop-in-shops.

\*       \*       \*

As you can see from our guidance, we are anticipating another strong fourth quarter.  The recent acceleration in sell-through of the UGG brand at retail combined with our inventory investments, has us well-positioned for the holiday season in the U.S. and in our direct international markets.

\*       \*       \*

So it's shaping up to be another record year for the company.  The UGG brand is on pace to surpass $1 billion in annual sales.  The Teva brand is projected to report its second consecutive year of 20%-plus growth.  And our brand portfolio has never been stronger, thanks to the acquisition of the Sanuk brand.  At the same time, we're in excellent financial condition with no long-term debt and a projected year-end cash position of approximately $250 million with no short-term bank borrowing even after our purchase of the Sanuk brand and approximately $20 million in company stock repurchases.

Turning to 2012, the spring 2012 pre-book process for UGG, Teva and Sanuk brands went well.  The UGG brand spring line is expected to have a much greater presence at our domestic wholesale accounts next year, including sandals, espadrilles, boots, clogs and sneakers.  The mix of closed-toe footwear now comprises approximately 21% of the Teva brand spring line and will continue to be the driving force behind the brand's continued market share gains in the outdoor space.

The Sanuk brand was well into its spring selling period when we acquired it in July.  Management has made good progress growing the pre-book portion of the business and this is evident in their backlog at September 30.  Overseas the UGG brand spring line is still under-penetrated.  We believe that our newly established subsidiary provides a stronger platform to go after this large market opportunity.  Likewise, our direct operations in the U.K. and Benelux are influencing the Teva

brand's strategic direction in those regions, as well as neighboring countries like France.

25.      During this same conference call on October 27, 2011 defendant George stated:

We had a great third.  In the third quarter of 2011, net sales increased 49.1% to $414.4 million, versus $277.9 million in the third quarter of last year.  Net sales of UGG products increased 47.3% to $376.7 million versus $255.8 million in the third quarter last year.  Net sales of Teva products increased 7.3% to $14.7 million in the third quarter, compared to $13.7 million in the same period of 2010.

Sanuk brand sales were $15.6 million in the third quarter.  We began, including the Sanuk brands operations effective July 1, 2011, our acquisition date. Combined net sales of the company's other brands decreased 11.7% to $7.4 million in the third quarter 2011, compared to $8.4 million a year ago.

Included in these numbers are global retail store sales of $34.7 million, up 72.1% from $20.2 million in the third quarter 2010, driven by 13 new stores since September 2010 and a same-store sales increase of 15.4% for those stores that were open for the full three-month periods ended September 30, 2010 and 2011.

Sales for e-commerce business, which are included in the brand sales numbers as well, increased 18.3% to $10.3 million in the third quarter, up from $8.7 million in the prior-year period.

Also included in the brand sales numbers, domestic sales for brands increased 26% to $257.9 million, compared to $204.7 million in the third quarter of last year.  And international sales increased 113.8% to $156.4 million, compared to $73.2 million in Q3 2010.

International sales were 37.8% of total sales, up from 26.3% last year.

Now turning to the balance sheet, inventories at September 30, 2011 were $356.9 million, compared to $197.3 million a year ago.  By segment, UGG inventory increased $143.7 million to $324 million.  Teva inventory increased 50.4% to $16.9 million and our other brands inventory increased by $1 million.  Sanuk inventory totaled $9.2 million at September 30, 2011.  The increase in inventory at September 30, 2011 is primarily attributable to the growth in fourth quarter orders for the UGG brand, the warehousing of holiday inventory supporting the new wholesale European business that was previously fulfilled by international distributors and the increase in retail stores, compared to a year ago.

*          *          *

Now, moving on to our outlook.  Based on better than expected third quarter results, we are raising our fiscal 2011 guidance.  We now expect 2011 revenues to increase by approximately 33% over 2010 levels, up from our previous guidance of approximately 26% growth.

For the full year we now expect UGG brand sales to increase by approximately 32%, up from our previous expectation of 25%. We expect Teva sales to increase by approximately 20%. For the Sanuk brand, we now expect sales for the second half of the year to be in the high $20 million range versus our previous guidance in the low-$20 million range. And sales for other brands are expected to be down by approximately 10%, compared to 2010.

We currently expect fiscal 2011 diluted earnings per share to increase approximately 22% over 2010 levels, up from our previous guidance of approximately 17% growth. Our forecast is based on a full year gross profit margin of approximately 50% and SG&A as a percentage of sales of approximately 29%.

*          *          *

We're still in the planning stages and budgeting process for next year, so consistent with past practice, we'll provide more specific 2012 guidance when we report our Q4 results in February. But we want to share with you some initial insights, particularly as it relates to raw materials. Prices for our primary raw material, sheepskin, have continued to rise as have leather prices, which often move in correlation with one another. After increasing 30% in 2011 over 2010, our sheepskin costs will be up another 40% in 2012.

As we have discussed before, we have implemented programs to help mitigate the impact from higher sheepskin and raw material costs. These include selectively raising prices, increasing the mix of non-sheepskin product, exploring new footwear materials, new production technologies and U.S. production and supply chain efficiencies such as reduced freight cost and others. We think some of these measures, along with the expected growth of our retail division and higher concentration of international sales will help partially offset the increase in our cost of goods sold in the near term while others take more time before we see meaningful benefit flow through our P&L.

26.     On this news, Deckers stock rose $117.66 per share on October 28, 2011 from its close on the prior day of $106.18, or approximately 11%, on heavy trading volume, and correspondingly affected the price of Deckers options.

27.     The statements in ¶ 23 through ¶ 25 were materially false and misleading because Defendants knew or recklessly failed to inform investors that (1) the Company had not taken adequate steps to offset the increased price in sheepskin costs; (2) the Company's inventory for its UGG brand was at a maximum, which caused the Company to attempt to sell the products at

reduced costs; and (3) as a result of the foregoing, Defendants' statements regarding the Company's operations and earnings were false and misleading and lacked a reasonable basis when made.

28.     On November 9, 2011, Deckers filed its Form 10-Q with the SEC for the quarter ended September 30, 2011 ("Third Quarter 10-Q").  The Third Quarter 10Q reiterated and repeated the financial results set forth in the October 27, 2011 press release.  The Third Quarter 10-Q was certified by defendants Martinez and George as representing in all material respects, the financial condition of the Company and free from any untrue statements or omissions.

29.     Thereafter, on February 23, 2012 Deckers reported "record" results for its fourth quarter and fiscal 2011.  In its press release entitled "Deckers Outdoor Corporation Reports Record Fiscal and Fourth Quarter 2011 Financial Results; Company Reports Fiscal 2011 Sales Increased 37.6% to a Record $1.377 Billion; Fiscal 2011 Diluted EPS Increased 25.8% to a Record $5.07; UGG® Brand Annual Sales Increased 37.6% to a Record $1.202 Billion; Company Reports Fourth Quarter Sales Increased 40.4% to a Record $603.9 Million; Fourth Quarter Diluted EPS Increased 40.1% to a Record $3.18; Company Announces $100 Million Stock Repurchase Program", Defendants reported:

Fiscal 2011 Highlights

•      Net sales increased 37.6% to $1.377 billion compared to last year.

•      Gross margin was 49.3% compared to 50.2% last year.

•      Diluted EPS increased 25.8% to $5.07 compared to $4.03 last year.

•      UGG brand sales increased 37.6% to $1.202 billion compared to $873.1 million last year.

•      Teva® brand sales increased 23.1% to $124.8 million compared to $101.3 million last year.

- International sales increased 82.4% to $432.2 million compared to $236.9 million last year.

- Domestic sales increased 23.7% to $945.1 million compared to $764.1 million last year.

- Retail sales increased 50.4% to $189.0 million compared to $125.6 million last year; same store sales rose 6.3% on top of a 16.6% increase last year.

- eCommerce sales increased 16.0% to $106.5 million compared to $91.8 million last year.

Fourth Quarter Highlights

- Net sales increased 40.4% to $603.9 million compared to $430.1 million for the same period last year.

- Gross margin was 51.0% compared to 54.2% for the same period last year.

- Diluted EPS increased 40.1% to $3.18 compared to $2.27 for the same period last year.

- UGG brand sales increased 37.7% to $568.5 million compared to $412.8 million for the same period last year.

- Teva brand sales increased 45.9% to $19.4 million compared to $13.3 million for the same period last year.

- International sales increased 178.6% to $147.6 million compared to $53.0 million for the same period last year.

- Domestic sales increased 21.0% to $456.3 million compared to $377.1 million for the same period last year.

- Retail sales increased 36.5% to $98.8 million compared to $72.4 million for the same period last year.

- eCommerce sales increased 12.6% to $67.1 million compared to $59.5 million for the same period last year.

"Our fourth quarter results exceeded expectations and were the highest in the history of the Company for sales and profitability," stated Angel Martinez, President, Chief Executive Officer and Chair of the Board of Directors. "UGG brand sales once again grew at a robust pace during the holidays, fueling our record performance and easily pushing annual sales for the UGG brand above $1 billion for the first time. We are very pleased with the UGG brand results,

particularly the growing diversity of the sales mix in terms of product collections, distribution channels, and geographies."

"We are coming off a very strong period of growth in 2011 driven by investments in product development, marketing and advertising, and international and retail expansion" continued Martinez.  "We believe that each of these areas is critical to successfully developing global lifestyle brands, and we remain committed to these strategies going forward.  With the addition of the Sanuk® brand this July, we begin a new year with what we believe to be our strongest brand portfolio ever, with compelling growth prospects across our entire business as evidenced by our outlook for sales growth of 15% in 2012.  Our projected top-line expansion, which includes a higher contribution from retail sales and the Sanuk brand, along with selective price increases compared with 2011, is helping offset our second consecutive year of significant cost headwinds mainly related to increases in sheepskin prices.  We continue to pursue all available opportunities to further mitigate the impact of cost pressures and based on our initial visibility, we expect to experience relief beginning in 2012."

*     *     *

Inventories at December 31, 2011 increased 102.6% to $253.3 million from $125.0 million at December 31, 2010.  By brand, UGG inventory increased $107.1 million to $201.8 million at December 31, 2011, Teva inventory increased $6.6 million to $29.3 million at December 31, 2011, and our other brands' inventory decreased $1.5 million to $6.1 million at December 31, 2011.  Sanuk brand inventories were $16.1 million at December 31, 2011.  The increase in inventory orders, inventory for our direct subsidiaries in the U.K. and Benelux, the addition of the Sanuk brand and growth of our consumer direct division, carryover product from the holiday period which will be utilized to fulfill orders during 2012, and an increase in product costs.

*     *     *

Based upon current visibility, the Company expects full year revenue to increase approximately 15% over 2011 levels.

The Company expects full year diluted earnings per share to be approximately flat with 2011 levels due primarily to the increase in sheepskin costs in 2012 compared to 2011, which the Company projects adversely impact profitability by approximately $1.40 per diluted share.  This guidance assumes a gross profit margin decline of 200 basis points from 2011 levels due to an increase in costs of goods sold, partially offset by selective price increases, an increased contribution from retail sales, and the addition of the Sanuk brand for the full year.  This guidance also assumes SG&A as a percentage of sales of approximately 29%.

***

First Quarter Outlook

14

- The Company currently expects first quarter 2012 revenue to increase approximately 19% over 2011, and expects first quarter 2012 diluted earnings per share to be down approximately 50% compared to 2011.

- First quarter guidance includes estimates of approximately $3.5 million, or $0.06 per diluted share, associated with the amortization and accretion expenses related to the Sanuk acquisition.

- This guidance also assumes a gross profit margin of approximately 48% and SG&A as a percentage of sales of approximately 43%.

- In addition, first quarter guidance includes higher levels of fixed overhead for new retail stores, international infrastructure, and other general and administrative costs. As a reminder, a significant amount of our operating expenses are fixed and spread evenly on an absolute dollar basis throughout each quarter. This includes the costs associated with 18 new stores that were opened in 2011.

30.     On February 23, 2012, Defendants held a call with analysts to discuss Deckers'

fourth quarter and 2011 financial results. On this call, Defendant Martinez stated:

We're very pleased to report fourth quarter sales and earnings that exceed the levels that we outlined back in October. Our performance was driven by higher than expected demand for the UGG brand, primarily in our domestic wholesale channel. Fourth quarter UGG brand sales increased 38% easily pushing first – full year brand sales past $1 billion for the first time ever.

*        *        *

In aggregate, the response of the 2011 fall and spring lines was very positive, and we're confident that the evolution of the UGG brand is creating repeat customers and attracting new customers. The popularity of our classic boots was further enhanced this year by the Sparkles and triple Baily Button, which along with selected price increases helped drive steady growth of our largest collection.

31.     On this February 23, 2012 call, Defendant George also sought to portray Deckers'

exceptional current and future prospects, stating:

With regard to gross margin, we expect cost of goods sold, which comprised about 51% of sales in 2011, would have been approximately 10% in 2012 over 2011, as the result primarily of higher raw material costs, namely sheepskin, which are up approximately 40% over 2011 levels and up approximately 80% versus 2010.

The higher sheepskin cost – the higher sheepskin prices are costing us about 500 basis points of gross margin or roughly $1.40 in earnings per share in 2012.

However, primarily through selective price increases, the full year addition of Sanuk and a greater contribution from our retail division, we'll be able to offset about 300 basis points of the gross margin decline and fully offset the negative impact of our bottom line.

As we have discussed before we have also implemented long-term programs to help further mitigate the impact from higher sheepskin and raw material costs. These include increasing the mix of non-sheepskin products, new footwear materials and new production technologies, and taking advantage of lower cost production, including the United States, where we will begin sourcing product from later this year.

*          *          *

For the first quarter of 2012, we currently expect revenues to increase approximately 19% and diluted earnings per share to decrease approximately 50%, compared to the first quarter of 2011.

First quarter guidance includes estimates of approximately $3.5 million, or $0.06 per diluted share, associated with the amortization and accretion expenses related to the Sanuk acquisition.   This guidance also assumes a gross profit margin throughout each quarter.  This includes the costs associated with the 15 new stores that were not opened until the second half of 2011.

Therefore, due to the aforementioned increases in SG&A, we expect our earnings to decline in the first half of 2012 as compared to the first half of 2011, which are typically our lowest volume sales quarters, and increased over 2011 in the back half of the year.

32.     Defendants denied on the February 23, 2012 call that the unseasonably warm winter had impacted the Company to any significant degree.  Indeed, on this call Defendant Martinez lauded the fact that "[d]espite the mildest winter in recent memory, we still grew UGG brand sales 38% in the fourth quarter."  Martinez, in response to a subsequent question from an analyst at Jeffries & Co,, while conceding the warm winter, stated that UGG was not a "cold weather brand.  It is a comfort brand . . . ."

33.     On or about February 29, 2012 Deckers filed its Form 10-K for the fiscal year ended December 31, 2011 with the SEC ("10-K").   The 10-K reiterated and repeated the financial results for the fiscal year set forth in the February 23, 2012 press release.  Defendants

Martinez and George certified the 10-K as representing in all material respects the financial condition of the Company and further certified the 10-K was free from any untrue statements or omissions.

34.     The statements in ¶ 28 through ¶ 33 were materially false and misleading because Defendants knew or recklessly failed to inform investors that (1) the Company had not already implemented a program that would "fully offset" any bottom-line impact from higher sheepskin prices that the Company had locked in for 2012 – in fact, at the time Defendants gave this assurance, the Company was already suffering bottom-line losses due to higher sheepskin prices; (2) as of February 23, 2012, the Company was not on pace to record first-quarter earnings of approximately 50% of 1Q11; (3) as of February 23, 2012, the Company was not on pace to record flat earnings for FY2012 as compared to FY2011; (4) the Company inventory for its UGG brand was at a maximum, which was causing the Company to attempt to sell the products at reduced costs, which was impacting their earnings; and (5) the unseasonably warm winter weather was impacting their earnings, and in particular, the Company's main product, the UGG brand more than Defendants revealed.

35.     On April 26, 2012, the last day of the Class Period, Deckers issued a press release announcing its financial results for the first quarter 2012.

36.     In the April 26, 2012 press release, Deckers announced:

First Quarter Review

• Net sales increased 20.2% to $246.3 million compared to $204.9 million for the same period last year.

• Gross margin was 46.0% compared to 50.0% for the same period last year.

• Diluted EPS was $0.20 compared to $0.49 for the same period last year.

• UGG® brand sales increased 6.5% to $158.1 million compared to $148.4 million for the same period.

- Teva® brand sales decreased 1.1% to $49.8 million compared to $50.4 million for the same period last year.

- Sanuk® brand sales (acquired on July 1, 2011) were $32.4 million for the first quarter of 2012.

- Domestic sales increased 15.1% to $170.6 million compared to $148.1 million for the same period last year.

- International sales increased 33.5% to $75.7 million compared to $56.8 million for the same period last year.

- Retail sales increased 30.6% to $46.2 million compared to $35.4 million for the same period last year; same store sales were flat for the thirteen weeks ending April 1, 2012 compared to the thirteen weeks ending April 3, 2011.

- eCommerce sales decreased 7.5% to $21.7 million compared to $23.5 million for the same period last year.

Our first quarter performance was mixed versus our expectations, stated Angel Martinez, President, Chief Executive Officer and Chair of the Board of Directors. Sales growth was driven by the addition of the Sanuk brand combined with increased demand for the UGG brand spring line, partially offset by softness in boots due to the unusually warm weather.  The difference in the channel mix versus projections, along with some higher closeouts for the Teva brand and non-Classic UGG brand styles, put some additional pressure on overall gross margins on top of the higher product costs we had forecasted.

We'll soon be completing our fall booking process and we're encouraged by the level of domestic wholesale commitments for the UGG brand collection to date particularly given the mild winter, continued Martinez.  While we believe that the macroeconomic conditions in Europe have created a difficult selling environment, we remain optimistic about our future prospects throughout the continent. Looking ahead, I have confidence that we can continue to successfully navigate through the near-term challenges facing some areas of our business, while continuing to execute against our strategic plan aimed at delivering consistent sales and earnings growth over the long-term.

*          *          *

Full-Year 2012 Outlook

- Based on first quarter results combined primarily with lower international wholesale projections, the Company is revising its full year outlook.

- The Company now expects 2012 sales to increase approximately 14% over 2011, compared to previous guidance of approximately 15%.

- The Company now expects 2012 diluted earnings per share to decrease approximately 9% to 10% from 2011, compared to previous guidance for diluted earnings per share to be approximately flat year over year. This guidance assumes a gross profit margin decline of 250 basis points from 2011 levels compared to previous guidance which assumed a decline of 200 basis points. The year over year decline is due primarily to an increase in cost of goods sold and a higher level of closeout sales, partially offset by selective prices increases, increased contribution from retail sales, and the addition of the Sanuk brand for the full year. This guidance also assumes SG&A as a percentage of sales of approximately 30% versus prior guidance of approximately 29% due to the lower sales projections.

- Fiscal 2012 guidance assumes approximately $13 million, or $0.23 per diluted share, associated with the amortization and accretion expenses related to the Sanuk acquisition.

- Fiscal 2012 guidance assumes the Company's effective tax rate will be approximately 31% which is in line with prior guidance.

Second Quarter Outlook

- The Company currently second quarter 2012 revenue to increase approximately 8% over 2011.

- The Company currently expects to report a second quarter 2012 diluted loss per share of approximately $(0.60) compared to the diluted loss per share of $(0.19) reported in the second quarter of 2011.

- Second quarter guidance includes estimates of approximately $3.5 million, or $0.06 per diluted share, associated with the amortization and accretion expenses related to the Sanuk acquisition.

- This guidance also assumes a gross profit margin of approximately 43% and SG&A as a percentage of sales approximately 37% resulting from higher levels of fixed overhead for new retail stores, international infrastructure, and other general administrative costs. As a reminder, a significant amount of our operating expenses are fixed and spread evenly on an absolute dollar basis throughout each quarter. This includes the costs associated with 17 new stores that were opened in 2011.

37.    On this news, Deckers stock dropped from a closing price of $69.46 per share on April 26, 2012, to close at $51.829 per share on April 27, 2012, on volume of almost 15 million shares. This one day decline was approximately 25%, which correspondingly affected the price of Deckers options.

19

**LOSS CAUSATION**

38.     At all relevant times, Deckers stock was traded on the NASDAQ stock market. As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for Deckers securities.   Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's securities served to maintain the price at artificially inflated levels by maintaining and supporting a false positive perception of Deckers' business, operations, performance and prospects.

39.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial and operational condition or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was materially misleading to the market.  As a result of their failure to do so, the price of Deckers securities was impacted by the Defendants' fraud during the Class Period, directly causing Plaintiff and the Class to suffer damages when the truth eventually emerged.

40.     Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period directly caused losses to Plaintiff and the Class.   On the strength of these false statements, the Company's stock price was artificially inflated to a Class Period high of over $117 per share on October 28, 2011, and the price of Deckers options was correspondingly affected.

41.     As the truth began to emerge regarding the true financial condition of Deckers, the price of Deckers stock declined as the market processed each set of previously undisclosed facts, with the price of Deckers options correspondingly affected.  Each such disclosure removed a portion of the artificial inflation in the price of Deckers' securities, directly causing Plaintiff and other Class members to suffer damages.  On April 27, 2012, Deckers stock declined to a

close of $51.829 per share, a drop of over 50% per share from its Class Period high, and the price of Deckers options was correspondingly affected.

42.     Until shortly before Plaintiff filed this action, he was unaware of the facts alleged herein and could not have reasonably discovered the Defendants' misrepresentations and omissions by the exercise of reasonable diligence.

## APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

43.     At all relevant times, the market for Deckers securities was an efficient market for the following reasons, among others:

a.      Deckers stock was listed and actively traded on the NASDAQ, a highly efficient national market;

b.      As a registered and regulated issuer of securities, Deckers filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c.      Deckers regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.      Deckers was followed by multiple analysts, which followed Deckers' business and wrote reports which were publicly available and affected the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Deckers securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased Deckers securities between the time the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Decker's securities was impacted by Defendants' misrepresentations and omissions.

44.     As a result of the above, the market for Deckers' securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price.   Under these circumstances, all Deckers'

investors during the Class Period suffered similar injuries through their purchases at prices which were artificially inflated by the Defendants' misrepresentations and omissions.   Thus, a presumption of reliance applies.

## NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made and/or were statements of historical fact.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Deckers who knew that those statements were false when made.

## ADDITIONAL ALLEGATIONS OF SCIENTER

### Core Operations

46.     The Company's flagship product, UGG-branded boots, accounts for the majority of its earnings.   UGG boots are comprised almost exclusively of sheepskin.   As a result, to a large extent, the Company is really in the sheepskin business.   Leading up to the Class Period and throughout the Class Period, Defendants repeatedly confirmed that sheepskin pricing was the single most important component of their core operations.   Defendants George and Martinez

likewise consistently demonstrated their personal involvement with, and awareness of, the close

correlation between sheepskin pricing and Company earnings:

> Martinez (on the Company's February 24, 2011 earnings call):
>
> Below the revenue line, we're working just as hard to mitigate the impact on earnings from cost pressures flowing through our supply chain, including the following.  First, Deckers has locked in our pricing and supply for sheepskin in 2011, so the recent flooding in Queensland will not directly impact the business this year.  We will continue to make our UGG Australia product with the highest-quality sheepskin, leathers and suedes.  And second, we will continue to evaluate risk management techniques designed to minimize price volatility and help secure access to high-quality sheepskin through the purchasing contracts and pricing arrangements.
>
> George (on the Company's February 24, 2011 earnings call):
>
> We thought a year ago we were going to have some sheepskin cost increases and we raised some prices, but sheepskin cost increases didn't materialize for 2010.  So that was the other big driver that really drove the gross margin up.
>
> Martinez (on the Company's April 28, 2011 earnings call):
>
> We're also working closing with our manufacturers and suppliers to find other ways to find other ways to help offset the continued rise in commodity prices, mainly sheepskin.
>
> Martinez (on the Company's July 28, 2011 earnings call):
>
> Regarding input costs, we continue to work closely with our manufacturers and suppliers to address the continued rise in commodity costs w[hich] for Deckers is primarily sheepskin.

47.     Both Martinez and George continued to stress the direct relationship between the

price of sheepskin and the Company's earnings during the Class Period, including the following

statement from defendant George during the Company's October 27, 2011 earnings call:

> Prices for our primary raw material, sheepskin, have continued to rise, as have leather prices which often moved in correlation with one another.   After increasing 30% in 2011 over 2010 our sheepskin costs will be up another 40% in 2012.
>
> As we have discussed before, we have implemented programs to help mitigate the impact from higher sheepskin and raw material costs.  These include selectively raising prices, increasing the mix of non-sheepskin product, exploring new footwear materials, new production technologies, and US production, and supply chain efficiencies such as reduced freight costs and others.

We think some of these measures, along with the expected growth of our retail division and higher concentration of international sales, will help partially offset the increase in our cost of goods sold in the near term while others will take more time before we see meaningful benefit flow through our P&L.

48.     During the same October 27, 2011 earnings call, defendant George confirmed that

the Company had locked in sheepskin prices for all of 2012:

[Question:]   *Great, thanks for taking my question, guys.  Just a couple around costs and prices.  So the 40% increase, Tom [George], is that locked in now for the full year all of your sheepskin needs for next year?*

[CFO George:]          Yes, it is.

[Question:]   *Okay.  Then just remind me, because I know you had 10% cost of goods increases, overall what was your total or average price increase this year? And are you considering something similar for next year, greater, or less?*

[CFO George:]          We are still evaluating what pricing we are going to do for fall 2012 at this point in time.  We are going to raise prices on selected styles, but we need to finalize that as part of our process here as far as the planning process. This year we, again, raised it on selected styles, some of the newer product we raised it.  But, for example, this year with a 40% increase in sheepskin cost that is going to be difficult from a pricing point of view.  You really can't offset that kind of a cost increase.

Martinez (at January 11, 2012 Integrated Corporate Relations Xchange):

We have talked about this.  Gross margins have been impacted by sheepskin costs, but we anticipate, given some of the price increases we have taken, some of the changes to mix and now Sanuk, that we will be able to mitigate some of that. We estimate overall an increase in cost of goods sold of about 10%.  As I said, there will be some mitigating opportunities we are exploiting as aggressively as possible.

George (on February 23, 2012 earnings call):

Gross margin for the fourth quarter was 51% compared to 54.2% in the fourth quarter of last year.  The decline was due to an increase in product costs and higher closeout sales, partially offset by higher margins in our international business as a result of the transition to direct subsidiaries in the UK and Benelux.

49.     During the Company's February 23, 2012 earnings call, defendant George

abandoned all previously used qualifiers and unequivocally assured investors that Company was

able to "fully offset" any negative impact on the Company's bottom line.

**Booking Out Futures**

50.     The practice of placing orders in the footwear industry is called "booking out futures".  The majority of the business for all the Company's brands was known ahead of time through this process of booking futures.  In addition to futures that are already earmarked for a particular customer, the Company manufactures additional inventory for the particular season in order to meet "at-once" orders.  After a retailer received its futures orders, it could place additional orders as the inventory was sold to consumers.  However, it could not be guaranteed that the specifically requested inventory would be available for shipment during the season.  Approximately 90 percent of UGG sales are sold through futures, with 10 percent coming from at-once inventory.

51.     Beginning in the September/October 2011 time frame, the winter sales for UGG did not look good.  As mentioned, the futures orders would have likely been booked for the winter no later than September (and possibly earlier).  As early as September 2011, but no later than October 2011, UGG futures orders were being cancelled by retailers.  The cancellation policy for futures orders is 30 days before shipment.  In reality, however, the Company cannot prevent order cancellations so it is essentially a "gentlemen's' agreement".  The Company wants to preserve the relationship with the retailers so it generally does not enforce penalties for late cancellations.  However, the Company cannot cancel factory orders so the shoes are still manufactured.  Order cancellations accounted for the rising inventory levels as early as October 2011.

52.     On February 23, 2012, fifty-four days into the 90-day first quarter of 2012, knowing that investors were concerned about earnings, defendants assured the market that they were capable of fully offsetting any bottom-line impact from sheepskin prices and that 1Q12

earnings/EPS would be approximately $9,589,000 ($.245 per share) (50% of 2011's $19,178,000 ($.49 per share)).  If the Company had honestly been on pace for such earnings at that time, that would have meant it was averaging $106,554/day of earnings through the first 54 days of the quarter for a total of $5,753,400.  Yet, the Company ended up with a 90-day total of $7,887,000, which means that the last 36 days would have produced earnings of only $2,133,600 or $59,267/day.  That would represent a 44% drop in average daily earnings.

53.    There was no intervening catastrophe, or anything else unexpected, that could have caused a 44% drop in the Company's average daily earnings over the final five weeks of 1Q12.  The Company did not, for example, experience an unexpected decline in revenues that resulted in a hit to earnings.  In fact, the Company exceeded revenue guidance and mentioned nothing about increased cancellations.  Instead, it explained that the lower earnings were primarily due to an "increase in cost of goods sold," which was precisely the factor that defendants had promised investors in February 2012 would have **no** negative impact on earnings.[1]  In other words, the Company offered no explanation whatsoever for why the last 36 days of the quarter would be so dramatically worse than the first 54 days.  In fact, in light of the practice of booking out futures, barring an intervening catastrophe, there is virtually no way the Company could experience an unexpected drop in earnings of this magnitude.  This is true because, as of February 23, 2012, the Company would have already booked nearly all of its UGG sales for the five weeks remaining in the quarter.  This significant and inexplicable drop raises at least a strong inference that defendants had *not* honestly been on pace to achieve

---

[1]    The only other basis for defendants' correction, a higher level of closeout sales, was also an expressly recognized threat to earnings at the same time defendants gave their false assurances of their abilities to fully offset bottom-line impact and maintain level earnings. Moreover, in the same February 23, 2012 earnings call, Defendants assured the market that their closeout sales did ***not*** amount to "enough product to overweight any part of the market.  It never has been and certainly isn't this year."

1Q12 earnings that amounted to a 50% increase over 1Q11 earnings, but instead defendants either knew their statements to that effect were false or they deliberately and recklessly failed to look at or consider the readily ascertainable information reflecting the Company's true earnings and booked out futures as of February 23, 2012.

**FIRST CAUSE OF ACTION**
**(Violation of Section 10(b) and Rule 10b-5)**

54.     Plaintiff and the Class repeat and reallege each allegation above as if fully set forth herein.

55.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Deckers and the Individual Defendants (the "Section 10(b) Defendants").  The Section 10(b) Defendants (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.     The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

57.     The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts

27

were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

58.     As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's financial statements were true, accurate, and complete.

59.     Plaintiff and the Class invested in Deckers securities without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Plaintiff and the Class relied directly or indirectly on false and misleading statements made by the Section 10(b) Defendants, and/or an absence of material adverse information that was known to the Section 10(b) Defendants or recklessly disregarded by them but not disclosed in the Section 10(b) Defendants' public statements. Plaintiff and the Class were damaged as a result of their reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

60.     At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, Plaintiff and the Class were ignorant of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have invested in Deckers securities had they known the truth about the matters discussed above.

61.     Plaintiff and the Class are filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of their claim, and within five years after the violations with respect to Plaintiff's investments.

62.     By virtue of the foregoing, the Section 10(b) Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their transactions in Deckers securities.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Exchange Act)

64.     Plaintiff and the Class repeat and reallege each allegation above as if fully set forth herein.

65.     Each of the Individual Defendants, by reason of their status as senior executive officers and directors of Deckers, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of § 20(a) of the Exchange Act (the "Section 20(a) Defendants").   The Section 20(a) Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff and the Class's investments in Deckers securities within the meaning of § 20(a) of the Exchange Act.   Therefore, the Section 20(a) Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

66.     The Section 20(a) Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.   Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Section 20(a) Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

67.     The Section 20(a) Defendants knew or recklessly disregarded the fact that Deckers' representations were materially false and misleading and/or omitted material facts when made.   In so doing, the Section 20(a) Defendants did not act in good faith.

68.     By virtue of their high-level positions and their participation in and awareness of Deckers' operations and public statements, the Section 20(a) Defendants were able to and did influence and control Deckers' decision-making, including controlling the content and dissemination of the documents that Plaintiff contends contained materially false and misleading information and on which Plaintiff and the Class relied.

69.     The Section 20(a) Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

70.     As set forth above, the Section 10(b) Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the Exchange Act.

71.     As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their transactions in Deckers securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for relief and judgment, including:

A.     Determining that Counts I and II of this action are eligible for class treatment under Federal Rules of Civil Procedure 23, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.      Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.      Awarding such other and further relief as may be just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  September 21, 2012                           **FARUQI & FARUQI, LLP**

                                                     _/s/ James P. McEvilly, III_____
                                                     James P. McEvilly, III (No. 4807)
                                                     20 Montchanin Road, Suite 145
                                                     Wilmington, DE 19807
                                                     Tel: (302) 482-3182
                                                     Fax: (302) 482-3612

                                                     and

                                                     Richard W. Gonnello
                                                     rgonnello@faruqilaw.com
                                                     Emily C. Komlossy
                                                     ekomlossy@faruqilaw.com
                                                     Francis P. McConville
                                                     fmcconville@faruqilaw.com
                                                     369 Lexington Avenue, 10th Floor
                                                     New York, NY 10017
                                                     Tel: (212) 983-9330
                                                     Fax: (212) 983-9331

                                                     *Counsel for Plaintiff*