IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICHAEL PERCOCO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 12-1001-SLR |
| DECKERS OUTDOOR CORPORATION, ANGEL R. MARTINEZ, and THOMAS A. GEORGE, | ) ) ) ) ) ) | |
| Defendants. | ) | |

James P. McEvilly, III, Esquire of Faruqi & Faruqi, LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Richard W. Gonnello, Esquire, and Francis P. McConville, Esquire of Faruqi & Faruqi, LLP.

William M. Lafferty, Esquire, and Angela C. Whitesell, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: William F. Alderman, Esquire, and Alexander K. Talarides, Esquire of Orrick, Herrington & Sutcliffe LLP.

**MEMORANDUM OPINION**

Dated: July 8, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On August 1, 2012, plaintiff Michael Percoco ("Percoco"), individually and on behalf of all others similarly situated, instituted the present securities class action lawsuit against defendants Deckers Outdoor Corporation ("Deckers"), Angel Martinez ("Martinez"), and Thomas A. George ("George") (collectively, "defendants"). (D.I. 1) Presently before the court is defendants' motion to dismiss this action without leave to amend. (D.I. 15) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. For the reasons that follow, defendants' motion to dismiss is granted, and Percoco is denied leave to amend.

## II. BACKGROUND

### A. Parties

Michael Percoco is an individual who invested solely in put options[1] for Deckers. (D.I. 19 at 7) Deckers is a Delaware corporation with its principal place of business in Goleta, California. (D.I. 3 at ¶ 13) Martinez is and was, at all relevant times, Deckers' Chief Executive Officer. (D.I. 3 at ¶ 14) George is and was, at all relevant times, Deckers' Vice President and Chief Financial Officer. (D.I. 3 at ¶ 15)

### B. Deckers' Public Filings, Press Releases, and Earnings Calls

This action seeks damages for transactions and statements made by defendants between October 27, 2011 and April 26, 2012, inclusive (the "Class Period").[2] (D.I. 3 at

---

[1] Percoco did not invest in common stock and, therefore, was excluded from a similar action brought by Erich Bracht in California (D.I. 17, ex. 3), which was dismissed without leave to amend by the court in *Bracht v. Deckers Outdoor Corp.*, No. 12-cv-04768-r, slip op. at 2 (C.D. Cal. Oct. 2, 2012). (D.I. 17, ex. 1 at 2)

[2] Both the original and amended complaint state the Class Period starts on October 27, 2011. However, Percoco is seeking leave to amend, *inter alia*, redefining

¶ 1) In his complaint, Percoco alleges that defendants failed to disclose adverse facts regarding Deckers' UGG brand.[3] The complaint contains numerous block quotes taken from public filings, earnings calls, and press releases regarding the third and fourth quarter of 2011, as well as the first quarter of 2012. (D.I. 3 at ¶¶ 1,4-5, 35-36)

On October 27, 2011, Deckers announced record third quarter 2011 results, including increased sales, gross margins, and earnings per share. (D.I. 3 at ¶ 23) The press release also stated inventories had increased over 80%, the majority of which was driven by UGG, and that Deckers would experience further increases in raw material prices. (*Id.*) On an earnings call later that day, George indicated "[w]e think some of these measures . . . will help partially offset the increase in our cost of goods sold in the near term while others take more time . . . ." (*Id.* at ¶ 25)

On February 23, 2012, Deckers reported record results for its fourth quarter, noting increased sales, gross margins, and earnings per share. (*Id.* at ¶ 29) Deckers also announced record results for its fiscal year 2011, with increased sales and earnings per share up to $5.07 per share, but slightly decreased gross margins. (*Id.*) Deckers stated that projections for first quarter 2012 were based on an assumption of a 48% gross margin. (*Id.*) Martinez later indicated that Deckers "expects full year diluted earnings per share to be approximately flat with 2011 levels due primarily to the increase in sheepskin costs in 2012 compared to 2011, which [Deckers] projects

---

the Class Period as February 23, 2012 through April 26, 2012. (D.I. 19 at 13 n.8)

[3] UGG is a premium brand of footwear that relies on high quality sheepskin to provide its distinctive look and feel. (D.I. 17, ex. 9 at 13)

adversely impacts profitability by $1.40 per diluted share." (*Id.*) He also noted that expectations were for "first quarter 2012 revenue to increase approximately 19% over 2011, and . . . first quarter 2012 diluted earnings per share to be down approximately 50% compared to 2011." (*Id.*) This decrease in earnings per share would drop the earnings from $0.49 per share to approximately $0.245 per share. (See *id.*)

On an earnings call on February 23, 2012, George stated:

> The higher sheepskin cost – the higher sheepskin prices are costing us about 500 basis points of gross margin or roughly $1.40 in earnings per share in 2012. However, primarily through selective price increases, the full year addition of Sanuk and a greater contribution from our retail division, we'll be able to offset about 300 basis points of the gross margin decline and fully offset the negative impact of our bottom line.

(*Id.* at ¶ 31) On the same call, Martinez stated: "Despite the mildest winter in recent memory, we still grew UGG brand sales 38% in the fourth quarter" and that UGG is not "a cold weather brand. It is a comfort brand . . . ." (*Id.* at ¶ 32)

On April 26, 2012, Deckers issued a press release announcing its financial results for the first quarter 2012.[4] (*Id.* At ¶ 35) The press release noted increased sales, a decreased gross margin of 46%, and diluted earnings per share of $0.20 per share. Based on the performance through the first quarter, Deckers revised its full year forecast to first lower the expected increase in sales from 15% to 14%, and to lower its

---

[4] Paragraph 6 states that Deckers failed to meet **second** quarter earnings targets, yet paragraphs 35 and 36 indicates the April 26, 2012 earnings call clearly discussed **first** quarter financial results only. (D.I. 3 at ¶¶ 6, 35-36)

3

yearly earnings per share estimate from flat to decreasing "approximately 9% to 10%." (Id. at ¶ 36)

Following this news, Deckers stock dropped from a closing price of $69.46 per share on April 26, 2012, to close at $51.829 per share on April 27, 2012, on volume of almost 15 million shares. This single day decline was approximately 25%, which correspondingly affected the price of Deckers options. (Id. at ¶ 37)

## III. STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555; *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the

complaint as true, and view them in the light most favorable to the plaintiff. See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

### A. Section 10(b) Claims

According to Section 10(b) of the the Securities Exchange Act of 1934, 15 U.S.C. § 78a, it is unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and

5

> regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission to implement Section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630–31 (3d Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague

6

statements of intention or optimism which constitute no more than mere corporate puffery. *Id.*; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (D. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the significantly heightened pleading standard codified by the Private Securities Litigation Reform Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *City of Roseville Employees' Ret. Sys. v. Horizon Lines*, 686 F. Supp. 2d 404, 414 (D. Del. 2009) ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital Mgmt., Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting the current version of the [PSLRA], Congress expressly intended to substantially heighten the existing pleading requirements.") (internal quotations omitted). "The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at 252. First, the complaint must "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C. § 78u–4(b)(1)). This is the falsity requirement. Second, "with respect to each act or omission alleged to violate [§ 10(b)]," a plaintiff is required to "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). This is the scienter requirement.

Both of these provisions require that facts be pled "with particularity." With respect to the falsity requirement,

> the particularity standard echoes Rule 9(b) of the Federal Rule[s] of Civil Procedure, which is comparable to and effectively subsumed by the requirements of ... the PSLRA. Like Rule 9(b), the PSLRA requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story. Additionally, if an allegation regarding [a] statement or omission is made on information and belief, a plaintiff must state with particularity all facts on which that belief is formed.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal quotations and citations omitted). The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)." *Avaya*, 564 F.3d at 253. "Unlike Rule 9(b), under which a defendant could plead scienter generally, § 78u–4(b)(2) requires any private securities complaint alleging that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

In addition to these requirements, the PSLRA specifically addresses allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or

is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.

### 1. Falsity requirement[5]

Percoco has identified three examples[6] of allegedly false or misleading statements or omissions, all related to the press release or earnings call on February 23, 2012.

Percoco first alleges that George's statement regarding how the measures Deckers had implemented would "fully offset the negative impact of our bottom line" was materially false or misleading, because Deckers "had not already implemented a program that would 'fully offset' any bottom-line impact" from sheepskin prices that Deckers had locked in for 2012. (D.I. 3 at ¶ 34) Further, Deckers "was already suffering bottom-line losses due to higher sheepskin prices." (*Id.*) This is sufficiently particular to meet the falsity requirement.

Percoco then claims Martinez's statements that, "[d]espite the mildest winter in recent memory, we still grew UGG brand sales 38% in the fourth quarter" (D.I. 3 at ¶ 32), was false or misleading. However, Percoco concedes that fiscal year 2011 was a record year for Deckers and UGG. (D.I. 3 at ¶¶ 5, 29) Accurate statements of past

---

[5] Although this aspect of the PSLRA is referred to as the "falsity" requirement, "falsity" is used as shorthand for those false or misleading statements or omissions which must be pled with particularity under 15 U.S.C. § 78u–4(b)(1). *See Avaya*, 564 F.3d at 259.

[6] Paragraphs 27 and 34 of Percoco's complaint broadly claim that statements contained within nine pages of block quotes from public filings, press releases, and earnings calls were "materially false and misleading," and requires the reader to determine specific statements Percoco considered false or misleading and why. The court declines to do so. In his answering brief (D.I. 19), Percoco provided additional information to find sufficient particularity for some claims, which this court examines.

9

earnings do not create liability under Section 10(b). *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).

Last, Percoco claims three of Deckers' statements in its press release were false or misleading: (1) Deckers "expects full year diluted earnings per share to be approximately flat with 2011 level;" (2) Deckers "currently expects first quarter 2012 revenue to increase approximately 19% of 2011;" and (3) Deckers "expects first quarter 2012 diluted earnings per share to be down approximately 50% compared to 2011." (D.I. 3 at ¶ 29) Percoco offers three allegations in support of these claims: (1) "as of February 23, 2012, [Deckers] was not on pace to record flat earnings for FY2012 as compared to FY2011" (D.I. 3 at ¶ 34); (2) "as of February 23, 2012, [Deckers] was not on pace to record first-quarter earnings of approximately 50% of 1Q11" (*id.*); and (3) "over 90% of its orders had been booked and all of Deckers UGG Classics had completed shipping for the quarter" (D.I. 19 at 19; DI. 3 at ¶ 50-51). Assuming the factual allegations are true, Percoco has met his falsity obligation for this claim.

### 2. Scienter requirement

Percoco relies on two theories as to the scienter requirement, timing and "core operations" (D.I. 19 at 24-26), to provide a "strong inference" of the required state of mind. Neither, however, provides the necessary inference.

Simply noting that only a short period of time existed between defendants' statements or omissions and the reporting of the apparent inconsistency is insufficient to find an inference of scienter. *See In re NAHC, Inc. Sec. Litig.*, 2001 WL 12141007, at *20 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002) ("the short time frame

10

between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b) . . . ."); *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *14 (N.D. Tex. Feb. 26, 2002) *aff'd*, 342 F.3d 563 (5th Cir. 2003) (timing alone does not establish an inference of fraud). And unlike *Avaya*, where the widespread discounting had already happened and had already significantly impacted the bottom line, here Martinez and George were attempting to predict how much raw material costs would change over the remainder of the quarter. *See Avaya*, 564 F.3d at at 271.

Only in rare instances can core operations alone allow inferences of scienter, "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *see also Avaya*, 564 F.3d at 267-68 (3d Cir. 2009) ("The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."); *Rahman v. Kid Brands, Inc.*, 2012 WL 762311 (D.N.J. Mar. 8, 2012) ("[T]he Third Circuit has accepted as viable core operation doctrine arguments with other indicia of scienter in a totality-of-circumstances test . . . ."). Here, Percoco conflates fact and prediction. It is inconceivable that George and Martinez would not know the fact that sheepskin is a major driver in their cost of goods sold ("COGS"). However, at the time the alleged statements were made, it is certainly conceivable that neither George nor Martinez would be able to accurately predict either short or long term pricing of sheepskin, and how that would impact their COGS.

Therefore, a core operations inference is not reasonably drawn from the allegations at bar.

Moreover, a compelling inference against scienter is raised when individual defendants "increase[] their holdings of stock during the Class Period." *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *12 n.12 (D.N.J. Dec. 19, 2011); *see, e.g., In re Advanta Corp. Sec. Litig.*, 180 F.3d at 540-41 (inference of scienter is undercut when defendants "continue[] to hold a sizeable percentage" of their holdings); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572, 73 (E.D. Pa 2009) (defendants "increas[ing] their holdings" during class period "raises a compelling inference against scienter"). Here, defendants provided evidence that both George and Martinez purchased additional shares of Deckers stock during the Class Period. (D.I. 17, ex. 21-24)

As neither the timing nor core operations allows a reasonable inference of the required state of mind, and Deckers has provided a strong inference against scienter, Percoco's pleadings fail to meet the scienter requirement.

### 3. Safe Harbor provision

Contrary to Percoco's position, repetition of positive projections by defendants does not "neutralize the cautions." *Avaya*, 564 F.3d at 258 n.27. However, "[n]o manner of cautionary language can cure false statements knowingly made," and "a purposeful omission of existing facts or circumstances does not qualify as a forward-looking statement and is not protected by the safe harbor of the Reform Act." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *7 (D. Del. May 23, 2006).

The forward looking statements in this instance are clearly material, and both parties agree that Deckers' public filings and transcripts contained numerous cautionary statements related to "rising sheepskin prices, mild weather, and inventory." (D.I. 19 at 26-27) Percoco instead focuses his allegations on inferring that defendants knew the statements made were false when they were made and that the officers made statements knowing their "forecast goal was unattainable." (D.I. 19 at 28).

The court does not come to that conclusion. The evidence presented by Percoco clearly indicates Deckers was optimistic, but not unrealistic, in its outlooks. First, there is little evidence that would indicate its sales goals were unreachable or falsely made. Percoco claims a confidential witness, a "former national field sales manager," would be able to provide facts relating to the industry practice of "booking out" orders 3-6 months in advance, that 90% of Deckers' UGG sales were through this practice, and that Deckers was suffering from unprecedented cancellations of those future orders. (D.I. 19 at 13) Even assuming every statement Percoco believes this witness will make is true, such facts do not render the sales projection statements "false," as sales did not actually suffer. Deckers exceeded sales projections for the fourth quarter of 2011 and the first two quarters of 2012. (D.I. 17, exs. 8, 12, 20)

Second, contrary to Percoco's alleged claim about Deckers knowing and not informing investors that its six-step sheepskin price mitigation program was insufficient (D.I. 3 at ¶ 27; D.I. 19 at 6), Percoco's evidence indicates the opposite. On an earnings call on October 27, 2011, Deckers mentioned its mitigation efforts, specifically stating "[w]e think some of these measures . . . will help **partially** offset the increase in [COGS] in the near term, while others **take more time** before we see meaningful benefit flow

13

through our P&L." (D.I. 3 at ¶ 25) Deckers clearly informed investors that its short-term measures were likely insufficient, that its profit margins would be impacted and that, while other efforts are in place, those efforts would likely not provide immediate relief. (*Id.*)

Lastly, the evidence regarding earnings per share estimates that could be gathered from the complaint cannot be taken to indicate those claims were unattainable. Percoco relies on *Avaya* and the timing between the 2011 fourth quarter filings and earnings calls and the end of the first quarter of 2012 to infer knowledge it was unattainable. (D.I. 19 at 21, 24-25) This case is clearly distinguishable from *Avaya*, where the CFO predicted increasing profit margins weeks before the close of the quarter, despite data showing their margins were clearly eroding. See *Avaya*, 564 F.3d at 271. The record indicates that the predictions have consistently indicated decreasing profit margins (D.I. 3 at ¶¶ 25, 29, 31), and Martinez and George were attempting to provide an estimate for how much the raw material costs would increase compared to Deckers' ability to offset those costs through other measures. (*See id.*) Previous earnings per share was $0.49 per share, and estimations for first quarter were for $0.245 per share (D.I. 3 at ¶ 29); actual earnings were $0.20 per share (*Id.* at ¶ 36). A difference of $0.045 per share does not create an inference that the goal was

unattainable.[7] Even assuming all of Percoco's allegations to be true, they are insufficient to allow an inference that the claims were falsely made.

Percoco's allegations do not indicate directly, or even allow an inference, that any of Deckers' forward looking statements were falsely made or unreasonably based. Moreover, there was sufficient cautionary language in those statements. Therefore, the forward looking statements are immune from liability under the Safe Harbor provision.

### B. Section 20(a) Claims

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) (citing 15 U.S.C. § 78t(a)). Because Percoco has failed to state a claim under 10(b), the section 20(a) claims must be dismissed as well.

### C. Leave To Amend

Dismissal under Rule 12(b)(6) generally is not immediately final or on the merits. Third Circuit cases are clear that leave to amend should be refused "only on the grounds of bad faith, undue delay, prejudice, or futility." *See, e.g., Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) (citing *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000)). Deckers has not suggested bad faith, undue delay, or prejudice. Unless amendment would be futile, the court must grant plaintiff leave to file a second amended complaint. A finding of futility is proper when "the complaint, as amended, would fail to state a

---

[7] A similar conclusion is reached when examining the operating and profit margins. Although Deckers' original estimate for gross profit margin was 48%, the final value for the quarter was 46%. (D.I. 3 at ¶¶ 29, 36) This 2% absolute difference translates to a 4% relative difference; a 4% relative difference in gross profit margin is not comparable to the 50% relative difference in operating margin seen in *Avaya*. *Avaya*, 564 F.3d at 270-71.

claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citation omitted). In determining whether a claim would be futile, the district court applies the same standard of legal sufficiency as applies under Fed. R. Civ. P. 12(b)(6). *Id.*

Percoco does not offer any facts that would be provided in an amended complaint that would alter the court's decision.[8] The statements Percoco is expecting the identified confidential witness to make relate to facts of sales and inventory. (D.I. 19 at 13) Whether future sales were being cancelled is irrelevant if sales goals were exceeded for the quarters in which those future sales would have had an impact. (D.I. 17, exs. 8, 12, 20) Similarly, whether the informant declares inventory levels were high is immaterial if that merely restates information in Percoco's complaint (D.I. 3 at ¶ 34) and Deckers' statements of a nearly 100% increase in inventory from 2010 to 2011 (D.I. 3 at ¶ 29). No other allegations are specifically mentioned that would save an amendment from futility. Therefore, the court denies Percoco leave to further amend.

## V. CONCLUSION

For the foregoing reasons, the court grants defendants' motion to dismiss without leave to amend (D.I. 15). An appropriate order shall issue.

---

[8] Percoco's answering brief indicates he would provide "additional information and facts, including information from a confidential witness, which gives further support for a strong inference of scienter." (D.I. 19 at ¶ 30)

16